## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MARIO DION WOODWARD | ) | |
| William E. Donaldson Correctional | ) | |
| Facility – Death (H-11) | ) | |
| 100 Warrior Lane | ) | |
| Bessemer, AL 35023 | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE, CIVIL RIGHTS DIVISION | ) | |
| Office of the Assistant Atty. General | ) | |
| 950 Pennsylvania Ave., NW | ) | |
| Washington, D.C. 20530 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES MARSHALS | ) | |
| SERVICE | ) | |
| Office of General Counsel | ) | |
| CG-3, 15th Floor | ) | |
| Washington, D.C. 20530 | ) | |
| | ) | |
| *Defendants* | ) | |

_____)


### I.      Introduction

1.      This is an action under the Freedom of Information Act, 5 U.S.C. § 552

("FOIA"), seeking an order requiring the United States Department of Justice, Civil Rights

Division (the "Civil Rights Division") and the United States Marshals Service (the "USMS")

(together, "Defendants") to immediately produce agency records requested by Plaintiff Mario

Dion Woodward ("Plaintiff" or "Woodward").

2.     Defendants' failures to comply with their statutory obligations under the Freedom of Information Act have significantly prejudiced and harmed Mr. Woodward by denying him records necessary to the effective exercise of his constitutional and statutory rights, hence Mr. Woodward's recourse to this Court to compel Defendants' compliance.

3.     On September 28, 2006, Officer Keith Houts of the Montgomery Police Department was shot repeatedly in the line of duty and died two days later.  The shooting was captured on video by Officer Houts's dashboard camera, although the shooter remained unseen and his identity unknown.  In the hours following the shooting, the police determined that Mr. Woodward, already a suspect, was likely in Atlanta, and a "be-on-the-lookout" alert was issued for Mr. Woodward.  On September 29, one Joe Parker of the USMS arrested Mr. Woodward in Atlanta.  Mr. Woodward was indicted on two counts of capital murder, tried, and convicted on August 25, 2008.  A sentencing hearing was duly held, and pursuant to Alabama's capital sentencing scheme at the time, the jury recommended by a vote of 8-4 that Mr. Woodward be sentenced to life imprisonment without possibility of parole.  However, following a subsequent sentencing hearing before the trial judge, the judge overrode the jury's advisory verdict and imposed the death sentence, a practice which the Alabama legislature has since banned.  Mr. Woodward has been on death row since, as appellate proceedings remain pending.

4.     Mr. Woodward has a good-faith basis to believe that the investigation which preceded his arrest may have involved the use of a cell-site simulator, more colloquially known by the trade name "stingray," a device capable of not only intercepting cell phone metadata and tracking a cell phone user's location, but also eavesdropping on conversations and intercepting text messages, as well as otherwise collecting sensitive and constitutionally-protected content.

As multiple courts have recognized, the use of stingrays is a law enforcement technique fraught with constitutional questions, and directly impinges upon the validity of Mr. Woodward's arrest.

5.      Further, Mr. Woodward likewise has a good-faith basis to suspect the taint of police and prosecutorial misconduct in the investigation which led to his arrest.

6.      Mr. Woodward is unable to secure documents which would shed much-needed light on these concerns without resort to the disclosure mandated by the Freedom of Information Act.  Accordingly, he has requested that documents related to both issues be provided by the Department of Justice.  Both his requests have been denied, however, and administrative appeals have simply met with further denial, compounding the errors of the initial denials.  Having exhausted his administrative options, therefore, Mr. Woodward now seeks an order from this Court requiring the disclosure of the requested documents.

## II.      Parties

7.      Plaintiff Mario Dion Woodward ("Woodward") resides in Bessemer, Alabama, on death row at the William E. Donaldson Correctional Facility.

8.      Defendant the USMS is a federal law enforcement agency overseen and controlled by the United States Department of Justice.

9.      Defendant the Civil Rights Division is a subdivision of the United States Department of Justice, responsible for enforcing federal law prohibiting discrimination on the basis of protected characteristics such as race, color, sex, or disability.

10.      Both of the Defendants, as "establishment[s] in the executive branch of the Government . . . ." are "agencies" as defined in FOIA at 5 U.S.C. § 552(f)(1).

## III.      Jurisdiction and Venue

11.      This Court has jurisdiction over this action and these parties pursuant to 5 U.S.C. § 552(a)(4)(B).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     Venue properly lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B), which permits a plaintiff to bring an action such as the instant suit in the District Court of the United States for the District of Columbia, and 28 U.S.C. § 1391, because Defendants reside in this district.

## IV.     Factual Background

### The Houts Shooting and Mr. Woodward's Conviction

13.     On September 28, 2006, Officer Keith Houts of the Montgomery Police Department in Montgomery, Alabama made a routine traffic stop, pulling over a silver 2006 Chevrolet Impala.  As recorded by the dashboard camera on Officer Houts's vehicle, as he approached the stopped car, its driver shot Officer Houts five times without warning.  Officer Houts died two days later without having regained consciousness.

14.     The car in question was registered to Morrie Surles, who had purchased it for her daughter, Tiffany Surles.  Tiffany Surles was Mr. Woodward's girlfriend at the time.

15.     On the morning of the shooting, Ms. Surles's car was not at the apartment she shared with Mr. Woodward.  At no point during that day did Ms. Surles have personal knowledge that Mr. Woodward was driving or using her silver Impala.

16.     The day of the shooting, Ms. Surles's car was found burned in Montgomery.  No fingerprints or DNA evidence were found in or on the burned Impala.  Indeed, no eyewitness testimony or physical evidence was ever adduced which identified Mr. Woodward as the individual who had been driving the Impala at the time of the shooting.

17.     The day after the shooting, September 29, 2006, the USMS had been notified via anonymous tip that Mr. Woodward had been dropped off in Atlanta.  Pursuant to that tip, Agent Joe Parker of the Atlanta USMS investigated an address provided by the Alabama authorities.

While doing so, he saw Mr. Woodward at a gas station, and after getting a closer look at Mr. Woodward, arrested him for the shooting of Officer Houts.

18.     Mr. Woodward's capital murder trial began on August 18, 2008.  Jury selection lasted two and a half days, after which the guilt phase occupied the afternoon of August 20 through August 25.  On August 25, 2008, Mr. Woodward was convicted of two counts of capital murder as defined in Alabama law: murder of an on-duty police officer and murder with a weapon fired from a vehicle.

19.     The penalty phase before the jury took place from August 26 to August 27, 2008. On August 27, the jury recommended by a vote of 8-4 a verdict of life imprisonment without the possibility of parole.

20.     On September 25, 2008, the trial court held a sentencing hearing, following which it overrode the jury's life verdict recommendation, as then permitted under Alabama law, and sentenced Mr. Woodward to death.

21.     Since his sentencing, Mr. Woodward has been engaged in the process of securing postconviction relief on the basis of the numerous legal deficiencies afflicting the trial and sentencing process, including, *inter alia*, ineffective assistance of counsel, the offering of improper and racially-biased testimony, and the unconstitutionality of judicial override in capital sentencing.

**Mr. Woodward's FOIA Requests**

22.     Mr. Woodward has reason to believe that the authorities investigating the shooting of Officer Houts may have used cellphone tracking technology, or a "stingray" device, in furtherance of that investigation.  Specifically, the State's claim that investigators identified Mr. Woodward's precise location in Atlanta due to an anonymous tip is unsubstantiated,

unverifiable, and therefore subject to doubt.  Further, the USMS and the local police department

of Gwinnett County, Georgia, a component of the Atlanta metropolitan area, are publicly known

to possess stingray technology.[1]

23.     Stingray devices operate by mimicking cell phone towers, which prompts nearby

cell phones to connect to them.  This connection allows the stingray to identify and track specific

cell phones.

24.     While federal law enforcement agencies, including the Department of Justice,

have testified before Congress that as a matter of policy they use stingray devices in a manner

akin to pen registers, i.e. to collect metadata such as "dialing, routing, signaling and addressing

information" rather than the content of telephone conversations, there is no technical obstacle to

configuring or equipping stingray devices to eavesdrop on the content of calls.[2]

25.     Information about stingray use by law enforcement agencies remains scarce, due

in large part to agencies' fierce opposition to disclosing any such information, to the point of

dismissing cases or withdrawing evidence rather than admit that stingray technology was used in

a given investigation.[3]  Law enforcement's refusal to permit open discussion of stingray use,

furthermore, has perpetuated the shroud of uncertainty surrounding the technology's capabilities

---

[1] *See* Am. Civil Liberties Union, *Stingray Tracking Devices: Who's Got Them?*, ACLU, https://www.aclu.org/issues/privacy-technology/surveillance-technologies/stingray-tracking-devices-whos-got-them?redirect=map/stingray-tracking-devices-whos-got-them (last visited May 24, 2018).

[2] STAFF OF H. COMM. ON OVERSIGHT AND GOVERNMENT REFORM, 114TH CONG., LAW ENFORCEMENT USE OF CELL-SITE SIMULATION TECHNOLOGIES: PRIVACY CONCERNS AND RECOMMENDATIONS 12-13 (Dec. 19, 2016).

[3] *See*, *e.g.*, *U.S. v. Patrick*, 842 F.3d 540, 546 (7th Cir. 2016) (Wood, J., dissenting) ("Until recently, the government has gone so far as to dismiss cases and withdraw evidence rather than reveal that the technology was used. Indeed, in this case, the government appears to have purposefully concealed the Stingray's use from the issuing magistrate, the district court, defense counsel, and even this court.") (citations omitted).

and the constitutionality of its usage: courts cannot investigate these questions if prosecutors are willing, as they generally have been, to go to any lengths to keep the relevant information secret.

26.     Notwithstanding the foregoing, numerous courts confronted with the issue have held that the use of a stingray device constitutes a search under the Fourth Amendment for which a warrant is required.[4]

27.     Given the potential implications of stingray usage for the validity *vel non* of Mr. Woodward's arrest, and by extension the admissibility of evidence obtained pursuant thereto, information regarding the use of stingray technology or other cell phone tracking technology in the investigation of Officer Houts's death is of considerable importance to Mr. Woodward in the preparation of his appellate claims.

28.     Additionally, the specter of misconduct by law enforcement authorities in Montgomery, including racial discrimination, pervaded Mr. Woodward's trial.  As such, Mr. Woodward has ample reason to seek disclosure of records related to any Department of Justice investigations of law enforcement in Montgomery County.

29.     Examples of misconduct by law enforcement authorities in connection with Mr. Woodward's case include the following:

> A.     The State used eleven of its twelve peremptory jury strikes to remove black jurors from the jury venire who shared virtually nothing in common except their race, raising the inference of racial discrimination by the prosecution.  The prosecutor in this case, furthermore, has been recognized by the Alabama Supreme Court to have engaged in a pattern of racially-discriminatory jury strikes.  Such discrimination is particularly pernicious in Mr. Woodward's case, given that he is African-American and was being tried for the murder of a white police officer.

> B.     The State improperly adduced racially discriminatory expert testimony, to wit, the testimony of Agent Al Mattox, a video enhancement expert with

_____

[4] *See, e.g.*, *U.S. v. Lambis*, 197 F.Supp.3d 606, 611 (S.D.N.Y. 2016); *Jones v. U.S.*, 168 A.3d 703, 714-15 (D.C. 2017).

the Alabama Bureau of Investigation, that Agent Mattox could tell from video of the shooting that the shooter was a black male based on the shooter's "mannerisms, movements, character traits [and] physical traits" as observed from the video.

C.   Investigators threatened key witnesses, including Tiffany Surles, with prosecution in order to secure their compliance with the investigation and their support of the State's theory of the case.

D.   Judge Truman Hobbs, who pursuant to Alabama law not only presided over Mr. Woodward's trial but also his petition for postconviction relief, refused to recuse himself from hearing the latter despite (i) Judge Hobbs's public admission that he felt significant public pressure in connection with judicial override in Mr. Woodward's case, and (ii) empirical data showing that Alabama judges had not once, between 1990 and 2005, provided postconviction relief to the same defendants they have sentenced to death by judicial override.

E.   The trial court permitted the overbearing and overwhelming presence of uniformed police officers in the courtroom, to the point that Mr. Woodward's sentencing proceedings had to be moved to a larger courtroom to accommodate the crowd, as well as the presence of Officer Houts's wife at the prosecution's table, moves plainly intended to show Montgomery law enforcement's determination to see Mr. Woodward convicted and to stir the jury's sympathies for the decedent and his family, respectively.

30.   Given the particularly sensitive context of a black man's capital trial for the murder of a white police officer, misconduct and racial discrimination on the part of law enforcement in Mr. Woodward's case is especially noxious and highly prejudicial to his rights. Correspondingly, records related to any federal investigations of civil rights violations by law enforcement in Montgomery County are indispensable to the proper preparation of Mr. Woodward's claims for appellate relief.

31.   On December 28, 2015, Mr. Woodward sent a letter via electronic mail and overnight mail (the "Request") to the Department of Justice, by and through counsel, requesting access to or the production of:

All records in any way relating to, pertaining to, or mentioning Department of
Justice investigations of law enforcement located in the County of Montgomery,
Alabama for civil rights violations during the time period of January 1, 1994
through today, December 28, 2015, including but not limited to investigations of
the Montgomery Police Department or the Montgomery District Attorney's
Office [as well as] [a]ll records in any way relating to, pertaining to or mentioning
the use of any cell phone tracking technology during the investigation of the
shooting death of Officer Keith Houts on September 28, 2006, by state and/or
federal law enforcement located in the State of Alabama and/or the State of
Georgia, including but not limited to the use of any GPS or "stingray" technology
by the Alabama Bureau of Investigations or the U.S. Marshalls [sic] located in
Alabama and Georgia.

A true and correct copy of the Request is attached hereto as Exhibit A.

### The Department of Justice's Responses

32.     On December 31, 2015, the Civil Rights Division responded to the Request,

noting that it had been assigned the tracking number "FOI/PA No. 16-00086-F" and advising

that:

> As a result of the large number of Freedom of Information and Privacy Acts
> requests received by the Civil Rights Division, some delay may be encountered in
> processing your request. In an attempt to treat each requester fairly, we have
> adopted a policy of processing requests in the approximate order of receipt. Please
> be assured that your request is being handled as equitably as possible. We
> appreciate your patience and will provide you with a response at the earliest
> possible date.

A true and correct copy of the Civil Rights Division's response dated December 31, 2015

is attached hereto as Exhibit B.

33.     On January 6, 2016, the Department of Justice responded to the Request as well,

via the Justice Management Division.  In its reply, the Justice Management Division

acknowledged receipt of the Request, stated that the Request had been assigned the tracking

number EMRUFOIA122815 and that federal agencies are required by law to respond to FOIA

requests within 20 business days of the earlier of (i) the request's receipt by the DOJ component

which actually maintains the records sought, or (ii) 10 business days after the request's receipt by

the Justice Management Division, and advised that the Request had been referred to the Civil

Rights Division and the USMS.  A true and correct copy of the Justice Management Division's

response dated January 6, 2016 is attached hereto as Exhibit C.

34.     FOIA explicitly requires that an agency in receipt of a FOIA request is required to

determine whether to comply with the request, and then immediately notify the requester of that

determination, within twenty business days.  5 U.S.C. § 552(a)(6)(A)(i).

35.     Under the terms of the statute, the latest permissible deadline for the Civil Rights

Division and USMS to respond to the Request would have been February 19, 2016.  This

deadline passed without incident or acknowledgement.

36.     On June 9, 2016, the USMS belatedly responded to the Request (the "USMS

Denial").  Specifically, the USMS acknowledged the specific language of the Request, and

advised that "[p]ursuant to [the Request], the USMS conducted a search of the Investigative

Operations Division.  The search located no records responsive to [the Request]."  The USMS

Denial further advised of the option to appeal, and concluded with the following language:

> For your information, Congress excluded three discrete categories of law
> enforcement and national security records from the requirements of the FOIA. See
> 5 U.S.C. 552(c) (2006 & Supp. IV (2010)). This response is limited to those
> records that are subject to the requirements of the FOIA. This is a standard
> notification that is given to all our requesters and should not be taken as an
> indication that excluded records do, or do not, exist.

A true and correct copy of the USMS Denial is attached hereto as Exhibit D.

37.     On August 9, 2016, Mr. Woodward appealed the USMS Denial to the Department

of Justice's Office of Information Policy (the "OIP"), by and through counsel (the "USMS

Appeal"), via overnight mail and the online portal for FOIA requests.  A true and correct copy of

the USMS Appeal is attached hereto as Exhibit E.

38.     The USMS Appeal noted that the USMS' search for records was by its own admission limited to the Investigative Operations Division, thus failing to extend to potentially-responsive documents "in any other database or repository within the USMS' possession, custody and control . . . ."  The USMS Appeal further pointed out that the USMS Denial "does not indicate whether the USMS' search included a search for records possessed by the Alabama and Georgia District – which were specifically identified in the Request."

39.     The USMS Appeal requested that the OIP expedite its consideration thereof "in every way possible," and noted that in any event, Mr. Woodward "[would] expect to receive a decision within twenty (20) business days, as required by law."

40.     The OIP timely responded to the USMS Appeal by letter dated August 23, 2016 (the "First OIP Denial").  A true and correct copy of the First OIP Denial is attached hereto as Exhibit F.  The OIP affirmed the USMS Denial, averring that the databases searched included certain Georgia and Alabama records and contending via boilerplate language that the USMS' search was proper and adequate.

41.     The Civil Rights Division responded to the Request on May 15, 2017, nearly a year and a half after the Request was originally submitted, addressing each of the Request's two prongs in turn and declining to produce any documents in response to either (the "CRD Denial"). A true and correct copy of the CRD Denial is attached hereto as Exhibit G.  As with the USMS Denial, the CRD Denial advised of the option to administratively appeal the decision.

42.     As to documents pertaining to investigations of law enforcement in Montgomery, Alabama, the Civil Rights Division stated that, after review of responsive documents, it had been determined that:

> [A]ccess to the documents should be denied pursuant to 5 U.S.C. § 552(b)(5)
> since the records constitute predecisional deliberative material and attorney work

product and pursuant to 5 U.S.C. § 552(b)(7)(E) since the records consist of sensitive investigation techniques which, if released, could reasonably be expected to risk circumvention of the law.

43.     As to documents pertaining to the use of cell phone tracking technology during the investigation of Officer Houts's shooting, the CRD Denial stated that "after a thorough search," it had been determined that the Civil Rights Division has no records on the subject.

44.     On August 10, 2017, Mr. Woodward timely submitted his appeal of the CRD Denial by and through counsel (the "CRD Appeal"), via overnight mail and the online portal for FOIA requests.  A true and correct copy of the CRD Appeal is attached hereto as Exhibit H.

45.     The CRD Appeal raised three deficiencies with the CRD Denial.  First, the refusal to produce any records relating to investigations of law enforcement in Montgomery, Alabama was insufficiently supported relative to its very broad scope (i.e. the period of 21 years established in the Request).  Second, if any portions of requested documents were withheld on the basis of privilege or a statutory exemption, the Civil Rights Division was obligated to describe the withheld material and explain the basis for the conclusion that a statutory exemption or privilege applies.  Third, the Civil Rights Division's statement that it has no records on cell phone tracking technology used in connection with the investigation of Officer Houts's shooting failed to specify the nature or category of documents searched, as well as conflicting with publicly-available information about the use of stingray technology by law enforcement in Georgia.

46.     The Office of Information Policy acknowledged that it had received the CRD Appeal on August 11, 2017 (the "OIP Acknowledgement").  A true and correct copy of the OIP Acknowledgement is attached hereto as Exhibit I.

47.     In addition to noting the statutorily-mandated deadline of twenty days for the

Office of Information Policy to issue its decision, barring limited extenuating circumstances, the

CRD Appeal requested expedited consideration.  By letter dated August 14, 2017 (the

"Expedited Processing Notice"), the Office of Information Policy advised Mr. Woodward that

"expedited processing of your appeal is warranted.  Accordingly, your appeal will be

administratively adjudicated as quickly as practicable."  A true and correct copy of the Expedited

Processing Notice is attached hereto as Exhibit J.

48.     The statutory deadline for the Office of Information Policy to make a

determination with respect to the CRD Appeal was September 8, 2017.  That date passed without

any action by the Civil Rights Division or Office of Information Policy.

49.     The Office of Information Policy belatedly responded to the CRD Appeal by

letter dated September 29, 2017 (the "Second OIP Denial").  A true and correct copy of the

Second OIP Denial is attached hereto as Exhibit K.  The Second OIP Denial affirmed the CRD

Denial, on both stated grounds (i.e., 5 U.S.C. § 552(b)(5) and 5 U.S.C. § 552(b)(7)(E)), denied

the CRD Appeal's request for an itemized list of information withheld, and contended that "the

Civil Rights Division's response was correct and that it conducted an adequate, reasonable

search for [responsive] records."

### V.      Administrative Exhaustion

50.     Mr. Woodward has constructively exhausted his administrative remedies as to

Defendant the USMS, pursuant to 5 U.S.C. § 552(a)(6)(C).  Mr. Woodward filed his FOIA

request with the Department of Justice on December 28, 2015, and the USMS received it by

January 6, 2016.  The USMS notified Mr. Woodward that it had denied the request on June 9,

2016, long past the statutory deadline to respond.  Mr. Woodward then appealed that denial on

August 9, 2016.  The Office of Information Policy timely responded on August 23, 2016,

affirming the initial denial, constituting exhaustion of Mr. Woodward's administrative remedies

with respect to his request for documents from the U.S. Marshals Service.

51.     Mr. Woodward has exhausted his administrative remedies as to Defendant the

Civil Rights Division.  The Civil Rights Division received Mr. Woodward's FOIA request by

January 6, 2016.  After nearly a year and a half, the Civil Rights Division notified Mr.

Woodward that it had denied the request on May 15, 2017.  Mr. Woodward appealed that

adverse determination on August 10, 2017, and the Office of Information Policy acknowledged

receipt of the appeal the following day, triggering the statutory twenty-day time limit to notify

Mr. Woodward of its determination.  That time limit expired without such a determination.  The

Office of Information Policy eventually affirmed the initial denial, exhausting Mr. Woodward's

administrative remedies with respect to his request for documents from the Civil Rights Division.

## VI.     Claims for Relief

52.     Plaintiff restates and realleges the allegations in the preceding paragraphs and

incorporates them as though fully stated here.

53.     An agency responding to a FOIA request is obliged to conduct a thorough search,

reasonably calculated to uncover all responsive documents, and if it wishes to withhold

potentially-responsive documents on the basis of one or more statutory exemptions, the agency

bears the burden of justifying the application of any such exemption.  An agency may not shirk

this responsibility by undertaking an inadequate search for records, nor rely on conclusory and

generalized invocations of FOIA's statutory exemptions.

54.     With respect to Defendant the USMS, the USMS Denial states only that "the

USMS conducted a search of the Investigative Operations Division[,]" and that "[t]he search

located no records responsive to your request."  This indicates that the USMS failed to search for

documents responsive to the Request in any other database, collection, or repository within the

USMS' possession, custody, or control, including the records of US Marshals in Alabama and

Georgia specifically identified in the Request, as well as records maintained by any of the

USMS' other divisions and offices.

55.     As a general matter, the USMS Denial is silent as to *how* the search was

conducted.  The only facts set forth are that the Investigative Operations Division was searched,

and that no responsive records were located by that search.  The USMS Denial does not explain,

for instance, the nature of the records searched, the methods employed in searching, the methods

by which materials were determined to be responsive or non-responsive, or the scope of the

Investigative Operations Division records searched.  By definition, a FOIA request denial which

tells the requester nothing about the search except its ultimate outcome cannot satisfy the

agency's burden to demonstrate the adequacy of its search efforts.

56.     The USMS Denial makes offhanded reference, "[f]or your information," to the

law enforcement and national security exemptions from the scope of FOIA, but adds that the

statement "should not be taken as an indication that excluded records do, or do not, exist."  *See*

Exhibit D, at 2.  Accordingly, it is unclear whether the USMS is invoking any statutory

exemptions in connection with its denial of Mr. Woodward's requests for documents.  To the

extent the USMS is relying on the exemptions noted, as opposed to the non sequitur of simply

stating that they exist, such reliance is unjustified and improper: the USMS Denial sets forth no

facts indicating why otherwise-responsive documents might be determined to fall within the

statutory exemptions at issue, and therefore entirely fails to demonstrate the propriety of any

reliance on the specified exemptions.

57.     In short, the USMS Denial is deficient factually as well as legally: it tells Mr.

Woodward virtually nothing about the search conducted, the meager information provided makes

it clear that the search was improperly narrow in scope, and inasmuch as the USMS is relying on

any statutory exemptions to justify its non-production, it has presented no support for doing so.

As the USMS has failed to satisfy its burden of justifying its refusal to produce the documents

Mr. Woodward requests, an error compounded by the First OIP Denial's confirmation of its

refusal on appeal, the USMS has unlawfully withheld the requested documents.

58.   The Civil Rights Division's refusal to produce documents similarly violates its

obligations under FOIA, being overbroad and excessively vague.

59.   The Civil Rights Division's blanket refusal of Mr. Woodward's request for

documents relating in any way to investigations of law enforcement in Montgomery County,

Alabama for civil rights violations is critically unsupported.  It is not remotely credible that

within the entire array of documents requested, that is, **all** records "in any way relating to,

pertaining to, or mentioning" such investigations in Montgomery over a period of **twenty-one**

**years**, each and every document in the Civil Rights Division's possession, custody, or control is

either attorney work product or a law enforcement record containing sensitive investigative

techniques which, if disclosed, could reasonably be expected to risk circumvention of the law.

No facts are set forth to justify the breathtaking scope of this refusal.  FOIA does not permit the

cavalier invocation of statutory exemptions, without factual support, over the universe of

documents requested by Mr. Woodward.

60.   In addition to its overbroad scope, the CRD Denial failed to set forth information

justifying the Civil Rights Division's withholding of responsive documents pursuant to claims of

statutory exemption or privilege.  No facts about the withheld documents are set forth in the

CRD Denial.  The Civil Rights Division took the initial step of specifying the statutory

exemptions supposedly justifying withholding responsive documents, but failed to provide any

facts concerning the character and scope of the search, the nature, location, and number of the documents searched, and other factors which bear on the validity of its purported compliance with its obligations under FOIA.  As such, the Civil Rights Division failed to carry its burden of establishing not only the statutory basis for withholding given documents, but the factual predicate for its conclusion that each document in question fell within the scope of such exemption or privilege.

61.     Similarly, the CRD Denial avers that the Civil Rights Division, after "thorough search," has "no records pertaining to the use of any cell phone tracking technology during the investigation of the shooting death of Office [sic] Keith Houts."  *See* Exhibit F, at 1.  Here again the CRD Denial omits any details as to the nature of the search conducted, and that of the documents reviewed.  Consequently, this statement constitutes a conclusory and unsupported assertion which fails to justify the Civil Rights Division's refusal to produce documents.

62.     In response to Mr. Woodward's administrative appeal, the Second OIP Denial essentially rubber-stamps the Civil Rights Division's deficient response, and consequently does nothing to ameliorate the Civil Rights Division's failure to produce responsive documents as requested.  As such, the Civil Rights Division continues to unlawfully withhold documents responsive to Mr. Woodward's requests, in violation of its obligations under FOIA.

## VII.    Request for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants the USMS and the Civil Rights Division, and grant the following relief:

A.     Declare that Plaintiff has constructively exhausted his administrative remedies with respect to Defendant the USMS;

B.     Declare that Plaintiff has exhausted his administrative remedies with respect to Defendant the Civil Rights Division;

      C.      Declare that Defendants' refusal to release the records requested by Plaintiff violates the Freedom of Information Act;

      D.      Enjoin and order Defendants to disclose the requested records in their entireties and to make copies thereof available to Plaintiff;

      E.      Retain jurisdiction over this action until Defendants establish that they have complied with the relevant provisions of FOIA and the Order of this Court;

      F.      Award Plaintiff his costs and reasonable attorneys' fees incurred in this action as provided for by 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d); and

      G.      Grant Plaintiff such other relief as the Court may deem just and proper.


Dated: May 29, 2018
New York, New York

                       Respectfully submitted,

                       REED SMITH LLP

                       By: /s/ John Kennedy
                           John P. Kennedy (Bar No. NY0263)
                           599 Lexington Avenue
                           New York, New York 10022
                           Telephone: (212) 521-5400
                           Facsimile:  (212) 521-5450